UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20104-CR-MARTINEZ/BECERRA(s)(s)(s)

**UNITED STATES OF AMERICA**

vs.

**WALTER VEINTEMILLA,**

      **Defendant.**
_____/

## RESPONSE IN OPPOSITION TO APPEAL OF DETENTION ORDER

The United States of America files this response to the defendant's appeal of the detention order in this case. ECF No. 145. This Court should deny the defendant's appeal because he has not rebutted the presumption that no condition or combination of conditions will reasonably assure the safety of the community and his appearance in court. Even absent that presumption, the facts establish that the defendant is a danger to the community and risk of flight. Accordingly, this Court should deny the defendant's appeal, affirm the pre-trial detention order, and order the defendant detained pending trial.

## BACKGROUND

**1.**     **Procedural Background**

On February 10, 2023, the Hon. Lisette M. Reid authorized a complaint (the "Complaint") charging the defendant with crimes arising from his role in the assassination of Haitian President Jovenel Moise. ECF No. 3. Later, a Grand Jury returned a Third Superseding Indictment (the "Indictment") charging the defendant with (1) conspiring to kill and kidnap a person outside of the United States, resulting in death, in violation of 18 U.S.C. § 956(a)(1); (2) conspiring to provide material support and resources to carry out a violation of 18 U.S.C. § 956(a)(1), resulting in death,

in violation of 18 U.S.C. § 2339A(a); and (3) providing such material support, resulting in death, in violation of 18 U.S.C. § 2339A(a).  ECF No. 107.  Each count carries a maximum term of life imprisonment and an advisory life sentence under applicable Sentencing Guidelines.

The defendant was arrested on February 14, 2023, and appeared for initial appearance the same day.  ECF No. 111.  The Hon. Lauren F. Louis conducted a detention hearing on February 17, 2023.  ECF No. 130.  The government sought detention on the bases of danger to the community and risk of flight.  In support, the government proffered facts showing that, between February and July 2021, the defendant, motivated by his own desire for financial gain, knowingly funded a plot to forcibly remove President Moise that culminated in the President's murder.  Special Agents Michael Ferlazzo and Justin Carsten with the Federal Bureau of Investigation provided testimony.  The defense did not call witnesses.  At the end of the hearing, Judge Louis found that "no condition or combination of conditions will reasonably assure Defendant's appearance as required or the safety of the community if Defendant is released," and thus ordered the Defendant detained before and to the conclusion of trial.  ECF No. 145 at 1.  The defendant appealed to this Court seeking review of Judge Louis's detention order.  ECF No. 162.

**2.      The Government's Proffer[1]**

On July 7, 2021, the President of Haiti, Jovenel Moise, was assassinated in his residence in Port-au-Prince, Haiti.  That morning, armed assailants wearing ballistic vests entered the President's residence.  The President was shot twelve times and died as a result.  His wife, the First Lady, survived, but also suffered multiple gunshot wounds.

The investigation into the events of July 7 revealed the President's assassination was the

---

[1] The following was proffered by the government at the detention hearing.  ECF No. 150 ("Tr.") at 7-29.  As part of the factual proffer, the government also adopted and incorporated by reference the facts stated in the Complaints filed against VEINTEMILLA and Bergmann.  ECF No. 3.

culmination of months of planning spearheaded by Arcangel Pretel Ortiz ("Ortiz") and Antonio Intriago ("Intriago"), as principals of related South-Florida companies (collectively "CTU"), and funded by Worldwide Capital Lending Group ("Worldwide"), through its principal, the defendant WALTER VEINTEMILLA ("VEINTEMILLA").

Ortiz, Intriago, And VEINTEMILLA were each motivated by the expectation of financial opportunities in Haiti should they oust President Moise and replace him with their intended successor. At first, that intended successor was to be Christian Sanon ("Sanon"), a Haitian political hopeful who opposed President Moise's administration. With Sanon as president, Ortiz and Intriago through CTU, and VEINTEMILLA through Worldwide, expected to reap financial benefits by being awarded contracts for infrastructure projects in Haiti, the provision of security forces, and the provision of military-type equipment to a Sanon-led Haitian government.

Around February 2021, Ortiz and Intriago, as principals of CTU, agreed to support Sanon in his efforts to become President of Haiti. As for Worldwide and its principal, VEINTEMILLA, on April 30, 2021, VEINTEMILLA agreed to finance CTU's support of Sanon, and extended a $175,000 line of credit to CTU.

Witness interviews, flight records, seized electronic evidence, and documents confirm that CTU and Worldwide hosted meetings among coconspirators in April and May 2021, which were attended by Ortiz, Intriago, VEINTEMILLA, Frederick Bergmann Jr. ("Bergmann"), Sanon and other coconspirators.[2] At these meetings, conspirators discussed how to forcibly remove President Moise and install Sanon as President. They also discussed how to acquire weapons and military

---

[2] Ortiz, Intriago, Sanon, and Bergmann are each named in the Third Superseding Indictment. Ortiz and Intriago are charged with the same violations as VEINTEMILLA, and Sanon and Bergmann are charged for their illegal export of ballistic vests worn by the assailants that entered the President's home. ECF No. 107. A detention hearing regarding Bergmann and Ortiz was held on the same day as the defendant's hearing. ECF Nos. 131-32. Bergmann was released on a $1.5 million bond and Ortiz was ordered detained. ECF Nos. 128 and 132.

equipment to facilitate the conspirators' plan to remove President Moise and replace him with Sanon.

As to how to remove President Moise, the conspirators' plan vacillated from fomenting a public uprising that would force the President out of power, to physically removing him from power by kidnapping him, and, ultimately, to an assassination.

From early on, the principals of CTU retained and, with financial support from VEINTEMILLA, transported at least 20 ex-soldiers from the Colombian military to Haiti to assist in their plot to remove President Moise from power.

As the conspiracy progressed, Ortiz, Intriago, VEINTEMILLA, and Bergmann exchanged a number of written and audio communications in furtherance of their operational planning. These communications show, among other things, Ortiz distributing a whiteboard that featured an assault plan on the Presidential Palace to conspirators within the group, including in a May 6, 2021 message to VEINTEMILLA. The whiteboard, which was entered into evidence at the hearing as Government's Exhibit 1, described the use of "snipers," referenced a "militia team" that comprised ten "warriors-neutralizers" and showed the location of "palace security."

Later communications show VEINTEMILLA, Intriago, and Bergmann using coded language to discuss obtaining weapons and ammunition for conspirators in Haiti. This was seen in June 3, 2021 communications where VEINTEMILLA confirmed to Bergmann that VEINTEMILLA "just wired 15k to [James Solages][3] for screws." Special Agent Ferlazzo testified that "screws" and "nails" were words used as coded references by the conspirators for ammunition.

---

[3] Solages was a representative of CTU who helped coordinate efforts in Haiti and reported directly to Ortiz. Solages was present at the President's residence on the night of the assassination and has been identified as the individual who shouted "DEA" upon arrival at the President's residence to secure compliance from guards. Solages is named in the Third Superseding Indictment and charged with the same crimes as VEINTEMILLA.

The same day, Intriago texted Solages to confirm that "15k [was] on the way" and asked Solages to "please make it happens [sic]." Solages then stated "getting the screws as we speak." Intriago responded, "Ok hope you got enough screws," and reminded Solages that "the 20 workers don't work without tools," and noted that it "must be the complete set short drills and long ones." Special Agent Ferlazzo testified that "tools" or "instruments" were words used as coded references for firearms, and "workers" was used as coded references for the Colombian nationals.

Several days later, on June 7, 2021, VEINTEMILLA sent Ortiz a document titled "Loan Provided to Christian Sanon" that provided $15,000.00 to "[Solages] for screws and nails," and $250,000.00 for "100 Complete vest." Special Agent Ferlazzo testified that CTU had access to a large number of armored vests and planned to use those vests to outfit the Colombian nationals and others, to benefit Sanon. Special Agent Ferlazzo testified he understood these communications to show that VEINTEMILLA intended to lend Sanon funds to both support the purchase of ammunition ("screws and nails") and for armored vests ("100 Complete vest").

Other text messages demonstrate VEINTEMILLA'S growing impatience with the delay in executing President Moise's removal. For example, on June 7, 2021, VEINTEMILLA told Ortiz that if Ortiz does not give the order, people will always use the excuse that someone is not ready, and those who are ready should go out and demonstrate on the street as that is the only way to attract the news stations and make the president nervous enough to leave. Special Agent Ferlazzo testified these messages demonstrate VEINTEMILLA was advising Ortiz that Ortiz must order the operation to remove President Moise to go forward and that people needed to protest President Moise's presidency to assist in his removal.

The evidence showed an increased urgency to remove the President as the total funds expended by the coconspirators continued to grow. For example, on June 8, 2021, Ortiz sent

Solages an audio message stating, "we are in red numbers and we need go [sic] forward." Special Agent Ferlazzo testified that the message reflected Ortiz's concern that the delay in replacing President Moise had resulted in CTU not recouping its expenses, which is what Ortiz meant by "we are in red numbers," and that the operation needed to go forward.  Next, on June 9, 2021, Ortiz sent another audio message to Solages, in which VEINTEMILLA spoke to insist that "the plan has to be simultaneously . . . . it can't just be <u>hit the rat</u>, that's not how that's going to work 'cause then we are going to look horrible."  (emphasis added).  Special Agent Ferlazzo testified he understood the word "rat" to be a reference to President Moise.  He added that he understood VEINTEMILLA stating "the plan has to be simultaneously . . . . it can't just be hit the rat" to mean that the public demonstrations and the "hit" on President Moise needed to occur at the same time, because if President Moise was forcibly removed or murdered without the appearance of public support, the conspirators would suffer reputational damage.   Solages responded to this message with "Understood," and "roger that."

The same day, VEINTEMILLA messaged both Solages and Bergmann cautioning that the group had "lost the element of surprise" that they were risking people "informing" the "rat," a term Special Agent Ferlazzo testified the conspirators used to refer to President Moise.  In the same message, VEINTEMILLA further stated, "this is very dangerous for this reason is that we are pressuring for things to happen.  Later we do not want for you guys to tell us why didn't you factor this in and let us know.  So please understand the party has to happen or the personal [sic] is coming back because they do not want to get caught in this situation."  Special Agent Ferlazzo testified that he understood the term "party" to refer to the operation against President Moise.  He added that he interpreted this message as VEINTEMILLA warning that the operation to replace President Moise (the "party") had likely leaked, and urging Bergmann and Solages to help move

6

the operation forward quickly because otherwise it was "very dangerous" for those involved if they were to "get caught." The same day that VEINTEMILLA messaged Bergmann urging that the party had to go forward, Bergmann messaged Sanon confirming shipment of CTU-branded armored vest to Haiti for use by the Colombian nationals that the coconspirators had retained. That same day Solages also texted Intriago asking for 150-200 zip-tied handcuffs.

In or around mid-June 2021, the conspirators discussed that Sanon lacked the necessary qualifications to serve as President of Haiti and members of the conspiracy began to shift their support to another individual ("Individual-2") as President Moise's chosen successor. For Ortiz, Intriago, and VEINTEMILLA, however, the motivation of financial gain remained constant. Through CTU and Worldwide, the conspirators contracted with Individual-2, as they had with Sanon, to serve their financial interests once Individual-2 was installed as President. They did so by entering into purported "consultation agreements" with Individual-2 in which Individual-2 promised them future business contracts.

On June 14, 2021, VEINTEMILLA and Ortiz texted each other about getting these agreements with Individual-2 notarized. On this point, Special Agent Ferlazzo testified that VEINTEMILLA told Ortiz that these agreements could not be notarized until Individual-2 was in power. Ortiz responded with the suggestion that they send the documents to Solages so they could plan ahead. Agent Ferlazzo testified that he understood this exchange to mean VEINTEMILLA and Ortiz discussed Individual-2's signing of the new consultation agreements with CTU and Worldwide, and they needed to wait until Individual-2 was sworn in as President of Haiti before notarizing the same.

Subsequent messages show the coconspirators continuing to discuss efforts to secure

equipment for their operation. For example, on June 15, 2021, German Rivera[4] sent Ortiz a text message stating, in substance, that the Colombian nationals needed a battering ram to breach doors, as well as black caps, cash, balaclavas, gun holsters, and other materials. Likewise, in a June 20, 2021 message, Solages told Ortiz that he need "10 DEA Velcro patches, Front & Back and 26 mask full face cover" to arrive by June 22. Notably, Haitian law enforcement recovered DEA patches from the crime scene after President Moise's assassination.

As the operation or, as the conspirators referred to it in their communications, "the party" neared, the conspirators also tried to immunize their actions in Haiti. On June 28, 2021, Solages flew from Haiti to the Southern District of Florida to deliver a purported Haitian immunity agreement to Ortiz, Intriago, and VEINTEMILLA. The document was dated and ostensibly executed on June 22, 2021—weeks before the President's assassination and months into the conspirators' operational planning in Haiti. This document claimed President Moise "illegally and unconstitutionally extended his presidential mandate," and requested CTU's "urgent HELP and assistance," and promised CTU "immunity, protection, and security to their actions in our favor." On June 30, 2021, Ortiz texted a copy of the signed immunity document to Intriago, VEINTEMILLA, Solages, Rivera, and another conspirator. According to messages sent among the conspirators, the conspirators believed that this document would protect them from prosecution in Haiti once Individual-2 was sworn in as President.

By July 6, 2021, over 20 individuals from Colombia had traveled to Haiti to participate in the operation to remove President Moise by kidnapping or killing him. Their travel was arranged for and funded by VEINTEMILLA. On or about July 6, 2021, Ortiz and Intriago, in a

---

[4] Rivera was one of the Colombian nationals retained by CTU. He was one of the leaders of the Colombian men in Haiti. Communications show Rivera reported to Ortiz. Rivera was at the President's residence on the night of the assassination and is charged in the Third Superseding Indictment with the same crimes alleged against VEINTEMILLA. ECF No. 107.

8

series of text messages, in substance, asked VEINTEMILLA to pay these Colombian nationals. VEINTEMILLA responded, in substance, that things took too long, that there was no money or investors until Individual-2 was sworn into office, and that the operation had essentially failed. Ortiz responded, in substance, by stating he did not have permission to fail and reassured VEINTEMILLA that, by the end of the next day, VEINTEMILLA would see things better, and that things were just getting started.  President Moise was assassinated the next day.

On July 6, 2021, several conspirators, including Solages and Rivera, met before the assassination at a residence located near President Moise's Home.  Firearms and equipment were distributed and Solages announced to the room that their mission was to kill President Moise.

According to witnesses, on July 7, 2021, several conspirators drove a convoy to President Moise's residence.  Once the group of conspirators arrived outside the residence, Solages falsely announced to those inside that they were engaged in a "DEA Operation" in an attempt to ensure compliance by the President's security and other civilians.  A subset of Colombian conspirators, entered the President's residence, and assassinated him, leaving him dead from 12 gunshot wounds, and seriously injuring his wife while the President's two children hid in a room in the house.

3.   **Pre-trial Services Report**

As noted in the pre-trial services report, VEINTEMILLA is a dual citizen of Ecuador and the United States, having become a U.S. citizen in 2000.  VEINTEMILLA's passports were seized by law enforcement, and his only foreign travel in the last ten years was a 2016 trip to Ecuador, where his father resides.  VEINTEMILLA has resided in South Florida since 2012, and has siblings in Miami and New York.  His wife and three children also reside in Miami, as well as VEINTEMILLA's youngest daughter, who is physically disabled and requires 24-hour care.

As to his own physical condition, VEINTEMILLA stated he suffers from diabetes that he treats with prescribed medication. VEINTEMILLA has no prior criminal history.

**4.      Defendant's Proffer**

At the hearing, and again in the instant appeal, Defendant proffered the following facts in support of his request for bond. Tr. at 160-168 and 174-186.

Defendant noted that he has been aware of potential charges against him for a year and a half and made no attempt to flee the Southern District of Florida, nor had he been implicated in any further criminal conduct during that time. *Id.* at 161, 163, and 165. He further proffered that he had been cooperative when approached by law enforcement, consenting to a search of his phone, submitting to a voluntary interview, and offering to self-surrender. *Id.* at 162. The defendant also emphasized his ties to the community and obligations to his daughter who requires 24-hour care. *Id.* at 163.

As to the nature and circumstances of the offense, defendant asserted mitigation in his role having been financial and maintained his actions did not suggest dangerousness. *Id.* at 163. As to the strength of the evidence, the defendant challenged the government's characterization of his conduct in Haiti, arguing he was unaware of any plan for violence and only sought to force President Moise out so he could install Sanon as president and reinstate a democratic government in Haiti. *Id.* at 176-77. Notwithstanding his texts and statements outlined above, he maintained he was motivated by Haiti's development and not financial gain. *Id.*

**5.      Proposed Bond**

Defendant proposes a $3,000,000 bond co-signed by eight family members and friends and secured by their homes. As additional conditions, defendant proposes a pre-signed waiver of extradition; home confinement with GPS monitoring; no access to computers or internet; a

prohibition from obtaining more travel documents; and any other conditions the Court deems appropriate. Def's Br. at 4-5.

**6.     Detention Order**

In ordering the defendant detained, Judge Louis found that "the nature and circumstances of the offenses charged are exceptionally serious; they indicate a significant probability of danger, especially given the nature of the crime alleged (assassinating a sitting president of a foreign sovereign)." ECF No. 145 at 13. Judge Louis noted that the defendant's alleged actions "demonstrate preparation to commit an act of violence," and his provision of $15,000 for ammunition and $250,000 for armored vests "speak[s] to the magnitude of violence expected by Veintemilla and his co-conspirators." *Id*. As to the defendant's financial role in the conspiracy, Judge Louis noted that the defendant continued to funnel resources into the conspiracy "after receiving what is proffered to be an assault plan of the Palace," and held that his ability "to amass funds, beyond supporting a finding of his dangerousness, also speaks to his ability to amass funds to flee prosecution." *Id*. at 14. The court also observed that the weight of the evidence was strong and is supported by communications between the conspirators and testimony from witnesses. *Id*. at 16.

While Judge Louis acknowledged the defendant's ties to the community and lack of criminal history, the Court found that "this mitigation is outweighed by the gravity of his charged offenses and his alleged role in funding those charged offenses." *Id.* at 16 (citing *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1357 (M.D. Fla. 2003) (noting that presumption triggered by offense charged, specifically 18 U.S.C. § 956(a)(1), "militates against release," thus counterbalancing the lack of a criminal history)). As to the defendant's failure to flee after his initial interview with law enforcement, Judge Louis noted that "pre-indictment, Veintemilla did

11

speak with law enforcement voluntarily, but minimized his role and his knowledge of the conspiracy." *Id.* at 16. Judge Louis noted the government's argument, however, that, having now been indicted and confronted with significant evidence, the defendant could no longer deny the likelihood of punishment. *Id.*

As to the nature and seriousness of the danger the defendant posed if released, the court held that the evidence presented supports a finding that Veintemilla's dangerousness is targeted and specific." *Id.* at 16. In this regard, the court cited "the complexity of the offenses Veintemilla was allegedly able to plan, fund, and execute outside of the United States without leaving the country," in furtherance of a plot to "assassin[ate] [] a leader of a foreign government for personal financial gain." *Id.* at 17. Judge Louis held that "[t]o decide that another individual's life is worth less than one's own economic gain demonstrates a present danger to the community," and ruled that "the proffered evidence reflects a tolerance for and willingness to engage in violence to a degree that supports a finding that Defendant poses a danger to any person and any community." *Id*. at 15 and 17.

7. **Defendant's Appeal**

Defendant appealed on March 14, 2023. ECF No. 162. There, defendant asserts that Judge Louis's detention order was based "solely on the crimes alleged . . . and not on the facts presented at the hearing," failed to "enunciate what present danger [Judge Louis] believed Mr. Veintemilla posed to the community," and "placed undue weight on the rebuttable presumption of detention." Def's Br. at 5.

As to the bail factors, the defendant characterizes his role in funding a foreign leader's assassination as playing a "minor" role in a conspiracy the defendant describes as an effort to bring a "democratic government" to Haiti. Def's Br. at 3, 11. Addressing his history and characteristics,

the defendant asks the Court to rule that the presumption in favor of detention is rebutted by his cooperativeness and failure to flee in the immediate aftermath of the assassination, the medical needs of his daughter, his ties to South Florida, and his lack of criminal history. Def's Br. at 1-3; 11.

Finally, defendant urges the Court to conclude that he is a lower risk of flight because he suffers from diabetes and high blood pressure; that his risk of contracting a severe case of Covid-19 supports release; and that pre-trial confinement would unduly interfere with his Sixth Amendment rights to review evidence with counsel in a complicated case. Def's Br. at 12-14.

As detailed below, defendant's arguments in favor of release should be rejected and this Court should affirm Judge Louis's order of detention.

## LEGAL STANDARD

Where, as here, a person is ordered detained by a Magistrate Judge, the person may file a request that the District Court review the Magistrate Judge's detention order. *See* 18 U.S.C. § 3145(b). The District Court must conduct a *de novo* review. *See United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985). Review by the District Court contemplates an "independent consideration of all facts properly before it." *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987). If, upon a review of the parties' submissions and the evidence presented at the detention hearing, the District Court finds the Magistrate Judge correctly applied the law and made findings of fact supported by the evidence, the District Court may adopt the Magistrate Judge's order without a hearing. *United States v. King*, 849 F.2d 485 (11th Cir. 1988). But if necessary to the resolution of an essential issue of fact, the District Court may marshal further evidence by convening a hearing. *Id.* at 491.

In moving for pretrial detention, the government must establish that the defendant is a danger to the community by clear and convincing evidence or a flight risk by a preponderance of the evidence. *Id.* at 489-491. The government need demonstrate only one or the other to justify detention. *Id.* at 488. While the government always carries the burden of persuasion, "[t]he [Bail Reform] Act provides a rebuttable presumption of risk of flight or danger to the community when a defendant has been indicted for certain crimes." *United States v. Quartermaine*, 913 F.2d 910, 915 and 917 (11th Cir. 1990). "Once the statutory presumption [is] raised, the defendant carries the burden of production to come forward with evidence to rebut [it]." *Id.* However, even if the defendant produces evidence "sufficient to rebut the statutory presumption, the presumption 'remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors listed in section 3142(g).'" *Id.* (quoting *King*, 849 F.2d at 488).

In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the Court must consider several factors, including the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the defendant's history and characteristics; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

**<u>ARGUMENT</u>**

The evidence presented at the detention hearing firmly established that the defendant is a risk of flight and a danger to the community and should be detained pending trial. To begin, the government notes that the defendant was indicted on charges that give rise to a rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(B) (applying the presumption to violations of 18 U.S.C. § 956(a)); *Quartermaine*, 913 F.2d at 916 ("[a] grand jury indictment

provides the probable cause required by the [Bail Reform Act] to trigger [a] presumption" in favor of detention.). Thus, the defendant has the burden of producing evidence to rebut the presumption. Here, the record demonstrates that the defendant failed to produce evidence to overcome the presumption, and, to the contrary, the government produced abundant evidence to sustain it.

1.     **The Defendant Failed to Rebut the Presumption in Favor of Detention**

The defendant's efforts to rebut the presumption were wholly insufficient. The primary evidence presented in response to the presumption were the defendant's community ties, cooperativeness, failure to flee, and family obligations.[5] These facts, at best, speak to risk of flight and are easily outweighed by the fact that the defendant has international ties, a demonstrated ability to amass significant funds for his personal gain[6], and is now facing life imprisonment on charges supported by substantial evidence. Similarly, apart from his lack of criminal history, the defendant offered no credible evidence to rebut the presumption of dangerousness. "The lack of a prior criminal record, standing alone, is simply not sufficient to rebut the statutory presumption." *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fla. 2000).

Moreover, even if the defendant had presented sufficient evidence to rebut the presumption, the evidence introduced at the hearing amply established that the defendant is a danger to the community and a risk of flight under the Bail Reform factors.

2.     **The Nature and Circumstances of the Offenses Favor Detention**

The seriousness of the charged offenses cannot be overstated, as they show the defendant's

---

[5] As to the defendant's family obligations, the government is not unsympathetic to the needs of the defendant's daughter. However, that circumstance does not rebut the presumption or outweigh the fact that the 3142(g) factors support detention, as outlined herein.

[6] While the defendant asserts that he now faces financial struggles and reputational harm in the business community, he has more than half a million dollars of equity in his home and was able present a $3 million bond secured by the homes of at least eight friends and family members. Tr. at 164, 166. Thus, the government maintains that the defendant has substantial resources available.

willingness to endanger lives for his own financial gain. And the evidence presented highlighted the defendant's critical role in the assassination and made clear that, without the defendant's support, the coconspirators in Haiti would have never secured either the personnel or the equipment to carry out on attack on the President. Thus, the defendant's claim that he played a "minor" role that was "non-violent" and "not indicative of danger to the community," (Def's Br. at 11) is simply not borne out in the record.

Indeed, the evidence shows that, the day before the assassination, the defendant essentially told his coconspirators that he could no longer funnel money their way until Individual-2 was in power. Undoubtedly concerned by the implications of losing funding, Ortiz assured the defendant that things were just getting started and insisted that the defendant would see things differently by the end of the next day. The President was assassinated within 24 hours.

On this record, the fact that the defendant sat safely at home while the coconspirators he funded and urged into action entered the President's home to assassinate him, does not render him any less dangerous. To the contrary, his ability to put a foreign murder plot into action without ever boarding a plane is compelling proof of his dangerousness. For the same reasons, home confinement and the other conditions proposed by the defendant are simply inadequate to address the particular form of danger this defendant poses. Accordingly, the nature and circumstances of the offense support a finding that there is no set of conditions that could ensure the safety of the community or the defendant's appearance.

3.      **The Weight of the Evidence Favors Detention**

The weight of the evidence was well established at the detention hearing. The defendant is incriminated by, among other things, witness statements and text and audio communications establishing his active participation in the conspiracy and awareness that it contemplated the

President's forcible and violent removal. Documentary evidence further establishes that, despite that knowledge, the defendant continued to fund his conspirators' purchase of ammunition and paid for the travel of the Colombian nationals who traveled to Haiti to carry out the bidding of the conspirators, ultimately entering the President's home to assassinate him. Along with the foregoing, the evidence shows the defendant was not a passive participant in the conspiracy, as he is captured sending audio messages urging his coconspirators to move forward with the plan.

4. **The History and Characteristics of the Defendant Favor Detention**

The evidence of the defendant's conduct throughout the conspiracy also speaks to his characteristics. Despite the defendant's efforts to characterize conspiring to kidnap and kill a sitting President as simply working to bring a "democratic government" to Haiti, Def's. Br. at 3, the evidence shows the defendant sought to replace President Moise, by any means necessary, with a hand-picked successor simply for his own financial gain. When his first-chosen candidate became ineligible, he entered into agreements with Individual-2 to secure those financial interests. As noted in Judge Louis's Order, "Veintemilla and his co-conspirators are shown as placing their own economic gain over an individual's life and this not only speaks to his dangerousness, but also his willingness to flee to protect his economic gain." ECF No. 145 at 15. So the defendant's characteristics counsel in favor of detention.

5. **The Nature and Seriousness of the Danger to any Person or the Community Favors Detention**

The evidence presented at the detention hearing also established that the defendant was a present danger to the community. As Judge Louis held: "[t]o decide that another individual's life is worth less than one's own economic gain demonstrates a present danger to the community." ECF No. 145 at 15. Indeed, the evidence showed the defendant was preparing for a violent coup. While the defense argues he only provided ammunition and ballistic vests in furtherance of a

17

security detail for Sanon, Def's Br. at 4, that characterization fails to explain why the defendant felt compelled to refer to the ammunition he funded in the coded language of "screws and nails." Nor does it address why the defendant would be directing coconspirators on how to execute their plan to "hit the rat." Rather, the defendant's language reflects the conclusion that he was willing to facilitate violence in furtherance of his financial interests and that predisposition renders him a present danger to the community.

**6.     Neither COVID-19 nor the Sixth Amendment Require the Defendant's Release**

Assuming, *arguendo*, that the defendant is at risk of contracting a severe case of COVID-19 if incarcerated, that risk cannot outweigh the overwhelming evidence showing the defendant is both a danger and flight risk. As to defendant's claims regarding the Sixth Amendment, the government submits that neither the Bail Reform Act nor case law interpreting it support releasing an otherwise dangerous defendant to facilitate his preparation for trial. Such a position would essentially preclude pre-trial detention in any complicated case, which is not the law.

## CONCLUSION

For these reasons, this Court should deny the defendant's appeal, affirm Judge Louis's findings, and order the defendant detained.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:     /s/ *Monica K. Castro*
        Monica K. Castro
        Assistant United States Attorney
        Court ID. A5502776
        99 N.E. 4th Street
        Miami, FL 33132
        Tel: (305) 961-9013
        Monica.Castro@usdoj.gov