UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20104-BECERRA

UNITED STATES OF AMERICA,

v.

WALTER VEINTEMILLA,

     Defendant.

_____/

---

**WALTER VEINTEMILLA'S MOTION FOR A NEW TRIAL AND JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(c) and 33(a)**

---

Dated:  July 6, 2026

**KUDMAN TRACHTEN ALOE POSNER, LLP**

Tama Beth Kudman, Esq.
7108 Fairway Drive
Suite 130
Palm Beach Gardens, Florida 33418
Telephone: (561) 472-0811;
Facsimile: (561) 828-0210
Florida Bar No. 637432
tkudman@kudmanlaw.com

By: /s/ Tama Kudman

Respectfully Submitted,

**DESCALZO LAW, P.A.**

Marissel Descalzo, Esq
One Biscayne Tower
2 South Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 489-1018
Facsimile: (305) 489-3386
Florida Bar No. 669318
md@descalzolaw.com

By: /s/ Marissel Descalzo

**Table of Contents**

I.      Introduction…………………….…..………………………………….…..…1

II.     Relevant Facts…………………………………………………………….....3

III.    Legal Memorandum…………………………………………………….……6

        A.      The Law on Post-Trial Rule 29/33 Motions …….…………………………..…..6

        B.      The Evidence Adduced at Trial was Insufficient

                to Sustain a Conviction………………………………………………………..7

        C.      The Jury Was Not Given a Multiple Conspiracy Instruction Despite

                Evidence Supporting the Instruction…………….…………………………....11

        D.      The Government's Evidence of Multiple Conspiracies Resulted in a

                Material Variance from the Indictment……………………………………….14

        E.      The Provided Jury Instructions Were Confusing and Confused

                the Jury on Key Issues…………………………………………………..19

        F.      The Government Was Erroneously Permitted to Admit Prejudicial,

                Hearsay Evidence from a Non-Co-Conspirator…………………………...22

        G.      The Government Introduced Improper Evidence Despite the Court's

                Pre-trial Ruling Prohibiting it on 404(b) Grounds…………………….....24

        H.      The Cumulative Error Doctrine Applies Here and

                a New Trial is Warranted…………………………………………..…29

IV.     Relief Requested………………………………………………………..…30

**Cases**

*Ad-Vantage Tel. Dir. Cons. Inc. v. GTE Dir.Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994).........23, 24

*Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943).......................................................8, 9

*Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003).................................................................21

*Kotteakos v. United States*, 328 U.S. 750, 755 (1946)……………………………………..14, 17, 18

*Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)............................................29

*Pinkerton v. United States*, 328 U.S. 640 (1946) ............................................................................22

*Rehaif* v. United States, 588 U.S. 225 (2019) .................................................................................24

*Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) ................................................28

*United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998)......................................................7

*United States v. Armstrong*, 619 F.3d 380, 387 (5th Cir. 2010) .......................................................22

*United States v. Becker*, 569 F.2d 951, 961 (5th Cir.), cert. denied, 439 U.S. 865, 1048 (1978) ...12

*United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997) ...................................................12

*United States v. Caporale*, 806 F.2d 1487, 1499-1500 (11th Cir. 1986)...................................2, 14

*United States v. Carter*, 776 F.3d 1309, 1328 (11th Cir. 2015).................................................22, 29

*United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004)........................................14, 15, 17

*United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999)....................................................12

*United States v. Croft*, 124 F.3d 1109, 1121-22 (9th Cir. 1997)......................................................21

*United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001) ................................... 11, 14, 19, 29

*United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1347 (S.D. Fla. 2010)......................................28

*United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999)..........................................................7

*United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990) .....................................................7

*United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998)……………………………..7

*United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005)......................................................6

*United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990)....................................................7, 8

*United States v. Hooks*, 147 Fed. Appx. 956, 957-58 (11th Cir. 2005)...........................................28

*United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003).....................................................24

*United States v. Magluta*, 418 F.3d 1166, 1180 (11th Cir. 2005)......................................................22

*United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)......................................................6

*United States v. Mayweather*, 991 F.3d 1163, 1186 (11th Cir. 2021) ...............................................7

*United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005) .........................................................6

*United States v. Novaton*, 271 F.3d 968, 1005 (11th Cir. 2001)......................................................23

*United States v. O'Brien*, 75 F. 900, 904 (S.D.N.Y. July 1, 1896)...................................................11

*United States v. Parker,* 839 F.2d 1473, 1477-78 (11th Cir. 1988) ...................................................7

*United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984)........................................................29

*United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021) ..................................................29

*United States v. Perrier*, 619 Fed.Appx. 792, 796 (11th Cir. 2015) ................................................24

*United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008)................................................13

*United States v. Saintil*, 753 F.2d 984, 989, n. 7 (11th Cir.1985)....................................................28

*United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013).........................................................25

*United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994......................................................6, 7, 12

*United States v. Wall*, 116 F.4th 1285, 1308-09 (11th Cir. 2024)................................................2, 29

*United States v. Willner*, 795 F.3d 1297, 1306–07 (11th Cir. 2015.................................................6

iv

COMES NOW, Defendant, Walter Veintemilla, pursuant to Federal Rule of Criminal Procedure 29(c), respectfully moves for acquittal on all counts, and pursuant to Federal Rule of Criminal Procedure 33(a), moves for a new trial. Having fully preserved a number of evidentiary and other issues for appeal (which are herein renewed). What follows is an identification of just some of the issues which beg the Court to now enter a judgment of acquittal or new trial, and in support thereof, Mr. Veintemilla avers the following:

## I.   Introduction

The evidence presented at trial fell woefully short of establishing any of the crimes charged against Mr. Veintemilla, who is innocent. The jury's verdict in this case is directly traceable to a series of legal errors that when taken together should result in a judgment of acquittal or, in the interest of justice, should result in a new trial.

Rule 29 requires the Court to ask whether any rational juror, viewing the evidence in the light most favorable to the government, could have found every element of every charge proven beyond a reasonable doubt. As for Mr. Veintemilla, the answer is a resounding no. The government presented a total of 43 witnesses during their case-in-chief, most of whom did not know of and had never spoken with or met Mr. Veintemilla. Witness testimony established that the plot to kill President Moise was developed in Haiti one day prior to the assassination. There is no dispute that Mr. Veintemilla never went to Haiti and no evidence was adduced at trial establishing that Mr. Veintemilla was ever informed of or agreed to such plan. In sum, Mr. Veintemilla could not have been part of a conspiracy of which he was not aware.

Similarly, there was no evidence adduced at trial that Mr. Veintemilla agreed to participate in a plan to arrest President Moise. The government bore the burden of establishing beyond a reasonable doubt that Mr. Veintemilla agreed to an arrest plan and had knowledge that such an

arrest was without lawful authority, but no such evidence was presented. On the contrary, there was a remarkable lack of evidence in that regard. Further, the arrest warrant at issue in trial appeared valid and there was no evidence that Mr. Veintemilla discussed or believed that the arrest of Moise was premised on a false basis. Indeed, the involvement of Judge Wendelle Coq Thélo, J3-a former Haitian Senator, and known FBI asset also suggested that an arrest of Moïse would be lawful.

Rule 33 directs the Court to consider fundamental fairness and provides broad discretion to vacate a conviction and order a new trial when the "interests of justice" require. Here, there were several issues that had a profound effect on the jury's ability to fairly consider the scant evidence presented. As discussed in further detail below, the failure to give a multiple conspiracy instruction unfairly prejudiced Mr. Veintemilla. *See United States v. Caporale*, 806 F.2d 1487, 1499-1500 (11th Cir. 1986). There was also a prejudicial instructional video on modern warfare introduced by the government that should have been excluded as hearsay without any exception. Finally, the Court granted Mr. Veintemilla's pre-trial motion *in limine* to exclude prejudicial evidence under Federal Rule of Evidence 404(b) pertaining to unsubstantiated allegations that some of the funds he provided in furtherance of development projects in Haiti were the result of government loan fraud perpetrated by others. Despite the Court's acknowledgement that such evidence was irrelevant and prejudicial, the government introduced it.

Taken together, these issues precluded Mr. Veintemilla from receiving a fair trial. The Court should consider the cumulative error doctrine, *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984); *United States v. Wall*, 116 F.4th 1285, 1308-09 (11th Cir. 2024), and the cumulative effect the errors described above had on Mr. Veintemilla's ability to receive a fair trial. For these

2

reasons, fundamental fairness and the interests of justice require that Mr. Veintemilla's conviction be vacated, and a new trial be ordered pursuant to Rule 33.

## II.      Relevant Facts

Rodolphe Jaar testified that he provided material support to the assassination plot against President Moïse by providing guns and money to individuals in Haiti. (Jaar Testimony, Pg. 76 – 4/10/26 P.M.; Pg. 39 – 4/13/26 A.M.)[1] He confirmed he never met Mr. Veintemilla. (Jaar Testimony, Pg. 3 – 4/14/26 A.M.) He also confirmed none of the money he provided to Mr. Badio to "arrest" President Moïse came from Mr. Veintemilla. (Jaar Testimony, Pg. 3-4 – 4/14/26 A.M.)

He explained that there was a meeting that took place on July 6, 2021 at his mother's home in Haiti. (Jaar Testimony, Pg. 52 – 4/13/26 A.M.) That meeting was attended by Mr. Jaar, an individual named "Francis," James Solages, Joseph Vincent, German Alejandro Rivera-Garcia a.k.a. "Col. Mike," Duberney Capador, and Senator John Joseph. (Jaar Testimony, Pg. 52 – 4/13/26 A.M.) There, for the first time, there was a discussion about killing the President. (Jaar Testimony, Pg. 53 – 4/13/26 A.M.) Mr. Jaar testified that he was told, "We would go in, kill the president, then we would leave." (Jaar Testimony, Pg. 53 – 4/13/26 A.M.)  Mr. Jaar's testimony firmly established that Mr. Veintemilla was not part of the assassination planning, and there was no evidence adduced at trial that he knew the meeting took place or was informed about the plan.

John Joel Joseph ("J3") testified that he was present at key meetings and had direct knowledge of how the ultimate assassination unfolded. He noted that the only time the word assassination was ever mentioned in Walter's presence was during an introductory lunch on April 7, 2021, and in gest.  He testified that Sanon alone raised it — framing it as a conditional future

---

[1] Official trial transcripts are unavailable at the time of filing. All citations refer to the unofficial transcripts provided at the end of testimony each morning and afternoon during trial. The release of transcript restriction for the official transcript is scheduled for September 30, 2026.

possibility, not an actual decision or plan. (Joseph Testimony, Pg. 58 – 4/9/26 A.M.) Sanon stated that if President Moise did not resign, "either he would be arrested or he will assassinate him." (Joseph Testimony, Pg. 10 – 4/7/26 P.M.) Critically, J3 confirmed that no one, including Mr. Veintemilla, discussed it further. (Joseph Testimony, Pg. 58 – 4/9/26 A.M.) When the subject did arise, neither CTU nor Mr. Veintemilla were debating it. (Joseph Testimony, Pg. 10 – 4/10/26 P.M.) J3 admitted the comment was stated as a "joke". (Joseph Testimony, Pgs. 10-13 – 4/10/26 P.M.)

J3 testified that the decision to assassinate President Moïse was made exclusively by Joseph Badio, Joseph Vincent, and James Solages. (Joseph Testimony, Pg. 10 – 4/10/26 P.M., Pg. 26 – 4/9/26 P.M.)   This decision was not made in the presence of Mr. Veintemilla. (Joseph Testimony, Pg. 23 – 4/10/26 A.M.) When asked whether Mr. Veintemilla was present on any conference calls with Solages, J3 stated he did not know. (Joseph Testimony, Pg. 19 – 4/8/26 P.M.)

German Alejandro Rivera-Garcia also testified that he never met Mr. Veintemilla. (Rivera Testimony, Pg. 20 – 4/16/26 A.M., Pg. 57 – 4/20/26 A.M.) He testified that the only phone discussions that Mr. Veintemilla participated in pertained to development projects. (Rivera Testimony, Pg. 21 – 4/16/26 A.M.) The plan that was presented to Rivera-Garcia initially was regime change through popular protest. (Rivera Testimony, Pg. 25 – 4/16/26 A.M.) His role was to provide Dr. Sanon with security and to attend various meetings with him to facilitate the goal of regime change through popular protest. (Rivera Testimony, Pg. 45 – 4/16/26 A.M.) He further confirmed that any information he had about Mr. Veintemilla's alleged involvement in Haiti came from third parties and not from Mr. Veintemilla directly. (Rivera Testimony, Pg. 58 – 4/20/26 A.M.)

Rivera-Garcia confirmed that there were multiple plans to overthrow President Moïse and that those plans changed over time. (Rivera Testimony, Pg. 26 – 4/16/26 A.M.) He noted that in

4

July 2021, Joseph Felix Badio became his direct boss in Haiti and that Mr. Badio told him that President Moïse should be assassinated. (Rivera Testimony, Pg. 10 – 4/17/26 A.M.) He also stated that on the evening of July 6, 2021, he was instructed by Mr. Solages that the objective of the operation was assassination. (Rivera Testimony, Pg. 49-50 – 4/17/26 A.M.) He explained that it was clear once he moved to the "mountain house," which was Rodolphe Jaar's mother home, that the plot finally became an assassination plan as opposed to a plan to remove President Moïse through popular protest. (Rivera Testimony, Pg. 62 – 4/17/26 P.M.)

Again, there was no testimony or evidence presented that Mr. Veintemilla was aware of any of the meetings in Haiti or what was discussed during them. Notably, these meetings occurred the day before and same day as the assassination and no evidence showed any communication of such plans to Mr. Veintemilla.

Further, the only evidence regarding the hiring of the Colombian security detail supports a judgment of acquittal on Count 5, Expedition Against a Friendly Nation. All evidence regarding their hiring suggests that the men were engaged to protect Presidential candidate Sanon. (Rivera Testimony, Pg. 25, 45 – 4/16/26 A.M.) Mr. Rivera-Garcia expressly testified that they were hired to protect Dr. Sanon. (Rivera Testimony, Pg. 45 – 4/16/26 A.M.) The government adduced no evidence whatsoever that Mr. Veintemilla believed these men were hired for any other purpose. Even assuming that once in Haiti the Colombians' orders changed, such evidence could not support a conviction on Count 5 which requires that the men be *sent* to Haiti with the unlawful purpose.

Simply put, the trial was remarkable as to Mr. Veintemilla for the lack of any evidence sufficient to convict him.

### III.    Legal Memorandum

**A.  The Law on Post-Trial Rule 29/33 Motions**

Rule 29 requires the Court to enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29; *United States v. Willner*, 795 F.3d 1297, 1306–07 (11th Cir. 2015). The question is whether any reasonable jury could have found the charged offenses proven beyond a reasonable doubt. It could not here.

Rule 33 provides broader relief. Indeed, the Court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "That is a broad standard. It is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). The Court has discretion to reevaluate its prior legal rulings even if those rulings were not legally erroneous, and to evaluate the sufficiency of the evidence on a standard less demanding than Rule 29. *Id*. When considering a Rule 33 motion based on the weight of the evidence, the Court need not view the evidence in the light most favorable to the verdict. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985); *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005). The Court "may weigh the evidence and consider the credibility of the witnesses." *Martinez*, 763 F.2d at 1312. If the evidence "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the Court may set aside the verdict and grant a new trial. *Id.*

The distinction between Rule 29 and Rule 33 is especially important here where there exists both a lack of sufficiency of the evidence and other issues. As the court noted in *United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005), "[t]he sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction. " Whereas Rule 33 permits the Court to grant a new trial in scenarios where the jury is instructed improperly or a jury instruction

6

was omitted that should have been given. *Vicaria*, 12 F.3d at 198-99; *United States v. Mayweather*, 991 F.3d 1163, 1186 (11th Cir. 2021). And it further includes scenarios where the Court admits erroneous evidence that is either prejudicial or otherwise improper so long as the resulting error was not harmless. *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999). It is, however, conceded that an error is harmless unless "there is a reasonable likelihood that [it] affected the defendant's substantial rights." *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990).

Mr. Veintemilla also renews, without waiving or forfeiting, and expressly preserves for appellate review, all arguments that he previously made under Rule 29 (including arguments regarding the sufficiency of the evidence for jury instructions) and incorporates them by reference.

## B.  The Evidence Adduced at Trial was Insufficient to Sustain a Conviction

Proof of a conspiracy requires, at minimum, that the defendant knowingly agreed to join a scheme to commit the specific unlawful act charged. *See United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998); *United States v. Parker,* 839 F.2d 1473, 1477-78 (11th Cir. 1988). The government must show circumstances from which a jury could infer beyond a reasonable doubt that there was a "meeting of the minds to commit an unlawful act." *Adkinson,* 158 F.3d at 1154. The government was required to prove that the conspiracy to murder or kidnap President Moise existed, that Mr. Veintemilla *knew* about the stated conspiracy, and that he voluntarily agreed to join it. *United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990). Mere presence at meetings, mere association with conspirators, or even providing financial assistance, standing alone, is insufficient. *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998) ("[m]ere presence at the scene of a crime is not sufficient to support a conviction").

None of the cooperating witnesses or chat messages adduced by the government placed Mr. Veintemilla inside the conspiracy to murder or kidnap President Moise. John Joel Joseph ("J3") was a central cooperating witness who was present at key meetings in Haiti and had

7

knowledge of how the conspiracy evolved. His testimony directly contradicted the government's theory that Mr. Veintemilla was a knowing member of a conspiracy to murder or kidnap.

J3 is the only witness who testified to any reference of assassination in Mr. Veintemilla's presence.  He testified that this was said as a joke, and that no one reacted or responded.  The conditional nature of the statement, its description as a joke, and a lack of response by anyone undercuts any inference that Mr. Veintemilla agreed to the alleged conspiracy at that meeting. (Joseph Testimony, Pgs. 10-13 – 4/10/26 P.M.)

J3 was clear that the only person who mentioned assassination was Christian Sanon. (Joseph Testimony, Pg. 58 – 4/9/26 A.M.) [2]  J3 further stated that the assassination of President Moise was never discussed with CTU. (Joseph Testimony, Pg. 7 – 4/10/26 P.M.)  He stated that neither CTU nor Mr. Veintemilla were "debating that question." (Joseph Testimony, Pg. 10 – 4/10/26 P.M.) Silence in response to a third party's unilateral statemen, especially one framed as a joke, does not establish the knowing and voluntary agreement the law requires. *See United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990) (government must prove the defendant "voluntarily agreed to join" the conspiracy); *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inference upon inference").

J3 conclusively testified that the ultimate decision to assassinate President Moise was the independent and "personal decision" of Joseph Badio, Joseph Vincent, and James Solages – this decision was not made with or in the presence of Mr. Veintemilla. Specifically, J3 stated:

> A: "The decision that [Badio and Solages] made regarding assassinating President Jovenel Moise was their personal decision as I was against it and James Solages was steadfast as the chief commando who was going to be killing Jovenel Moise."

---

[2] "A: I explained to [the government that] during the meetings of the 5th and the 6th, we did not discuss assassination. During the meeting of the 7th, Sanon discussed assassination. Veintemilla did not discuss assassination. Arcangel did not mention assassination. Intriago did not [mention] assassination. James Solages did not mention assassination. Sanon stated, if Jovenel should not leave power, it's going to — he will be arrested or assassinated."

(Joseph Testimony, Pg. 26 – 4/9/26 P.M.) The government cannot sustain a conspiracy conviction against Mr. Veintemilla for a plot that the government's own primary cooperating witness described as a personal decision developed by others in Haiti that was never discussed with Mr. Veintemilla.

It is also notable that J3 did not know whether Mr. Veintemilla was even present on any conference calls with Solages — eliminating yet another potential avenue for inferring knowing agreement. (Joseph Testimony, Pg. 19 – 4/8/26 P.M.) The government's case rested on inference stacked upon inference, precisely the analytical approach that the Supreme Court has cautioned against. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943).

Turning to the testimony of Rodolphe Jaar – he testified unequivocally that he had never met Mr. Veintemilla and that none of the money that he collected for the arrest of President Moise was provided by Mr. Veintemilla. (Jaar Testimony, Pg. 3-4 – 4/14/26 A.M.) This testimony establishes a critical evidentiary gap between Mr. Veintemilla's remote financial activity in Florida and the actual conspiracy to murder President Moïse that was planned and executed in Haiti by actors with whom he had no connection.  Indeed, there was no evidence that any of the money provided by Mr. Veintemilla supported the kidnap or murder of Moise.German Rivera-Garcia likewise never met Mr. Veintemilla and only spoke to him a few times. (Rivera Testimony, Pg. 20-21 – 4/16/26 A.M.) He could not recall any meeting or phone call where anyone discussed murdering or kidnapping President Moise. Rivera-Garcia testified that by the end of May, he no longer had any contact with Mr. Veintemilla. (Rivera Testimony, Pg. 10 – 4/16/26 A.M) Mr. Veintemilla was not on any daily reporting calls with Ortiz. (Rivera Testimony, Pg. 10 – 4/16/26 P.M.) The government argued that Mr. Veintemilla was the financier of the operation, however, Rivera-Garcia testified that CTU and Mr. Veintemilla failed to provide payment to the

9

Colombians and any payment was "for their work of providing security to Mr. Sanon . . . and not for attacking the house of President Moise." (Rivera Testimony, Pg. 36-37 – 4/17/26 A.M.)

Attorney Jose Corrales also testified that it was Ortiz who asked for documents, such as the immunity agreement, to be drafted and that Mr. Veintemilla was not part of those discussions. Corrales was emphatic that discussions with Mr. Veintemilla focused on Haitian improvement projects, and that Mr. Veintemilla was not part of other discussions. Neither Mr. Veintemilla nor his company were included in the immunity agreement.

Interestingly, the people with whom Mr. Veintemilla raised money, Jacob Israel and Keegan Harrichan, testified that each knew nothing about a kidnapping or assassination plot. (Israel Testimony, Pg. 87 – 4/24/26 A.M.) Indeed, Jacob Israel repeatedly referred to "regime change."[3] The fact that these witnesses, who communicated most directly with Mr. Veintemilla, uniformly described their understanding of the endeavor as to support regime change, a concept repeatedly defined at trial as a legitimate change of government, is powerful evidence that Mr. Veintemilla lacked the specific intent and knowledge required for conviction.

The government introduced a summary exhibit in excess of 900 pages consisting of chats and text messages between the alleged co-conspirators. None of these messages show that Mr. Veintemilla intended to kidnap or kill President Moise.  The closest the evidence becomes is a singular voice message in which Mr. Veintemilla says:

> "[T]he plan has to be simultaneously, it cannot be just uh, hit the rat. That's not how that's gonna work, cause then we're gonna look horrible. What has to be done is, the people have to go in the street, and at the same time after the rat. That's the only way it's gonna work."

---

[3] (Israel Testimony, Pgs. 9, 13, 16, 17, 21 – 4/23/26 P.M.)

10

[GX 147D, page 133]. The message is unclear, vague, and susceptible to multiple interpretations. At best, it shows that Mr. Veintemilla believed that the people of Haiti were going to demonstrate and force Moise from office. Placed within the context of text messages just 2 days prior, where Mr. Veintemilla references demonstration in the street, this is consistent with lawful regime change emanating from the people of Haiti, not an external plot to kidnap and kill. *See* Defense Exhibit, WV69. (Dayton Testimony, Pgs. 73-74 – 4/1/2026).

Moreover, there was insufficient evidence to sustain a conviction on Count 5, "Expedition Against a Friendly Nation". Mr. Rivera-Garcia testified conclusively that him and the other Colombian nationals were hired for the express purpose of providing security to protect Dr. Sanon and attend civil society meetings with him. (Rivera Testimony, Pg. 45 – 4/16/26 A.M.) He further explained that his understanding was that regime change would come democratically through popular protest and that Dr. Sanon's presidency was supported by the United States. (Rivera Testimony, Pg. 15, 25 – 4/16/26 A.M.) As such, there was no evidence presented that the Colombian men traveled to Haiti to effectuate an arrest or assassination. A security detail is fundamentally different than a military expedition. *See United States v. O'Brien*, 75 F. 900, 904 (S.D.N.Y. July 1, 1896) (Defining a military expedition in Cuba as "[a]ny combination of men organized here to go to Cuba to make *war* upon its government, provided with arms and ammunition, we being at peace with Cuba, constitutes a military expedition.") (emphasis added).

**C. The Jury Was Not Given a Multiple Conspiracy Instruction Despite Evidence Supporting the Instruction**

An erroneous or missing jury instruction may be the basis for a new trial, if upon review, there is "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001). The reviewing court examines "whether the jury charges, considered as a whole, sufficiently instructed the jury so that

11

the jurors understood the issues and were not misled." *Id.* If the instructions are ambiguous, confusing, missing, or otherwise mislead the jury, then Rule 33 permits the court to grant a new trial in the interest of justice. *Vicaria*, 12 F.3d at 198. This is a broad standard. *Id.*

In a conspiracy case, where multiple defendants are charged with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment, a multiple conspiracy instruction is generally required. *United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997); *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999). While under most circumstances it is for the jury to determine whether one or several conspiracies existed, *United States v. Becker*, 569 F.2d 951, 961 (5th Cir.), cert. denied, 439 U.S. 865, 1048 (1978), whether the defense produced sufficient evidence to sustain an instruction such as a multiple conspiracy is a question of law. *See Calderon*, 127 F.3d at 1328. The key inquiry is "whether there is sufficient evidence for a reasonable jury to conclude that some of the defendants were involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *Chastain*, 198 F.3d at 1350.

Mr. Veintemilla specifically requested a multiple conspiracy instruction, but that request was denied. (Defense argument, Pg. 104-05 – 4/28/26) He argued that co-defendants Intriago and Ortiz knew and agreed to do certain things and were thus involved in a separate conspiracy because he was not a part of those discussions. (Defense argument, Pg. 104 – 4/28/26) Furthermore, there was the wholly separate conspiracy involving actors in Haiti, developed shortly before July 7, 2021, that failed to include Mr. Veintemilla entirely. He urged that the jury was likely to be confused without a multiple conspiracy instruction because there is a single conspiracy charged in the indictment, but the evidence established several separate agreements between different people.

For example, Mr. Jaar testified that he was told for the first time during a July 6, 2021 meeting at his mother's home that the plan was to kill President Moïse. (Jaar Testimony, Pg. 53 – 4/13/26 A.M.) That meeting was attended by Mr. Jaar, an individual named "Francis," James Solages, Joseph Vincent, German Alejandro Rivera-Garcia a.k.a. "Col. Mike," Duberney Capador, and Senator John Joseph. (Jaar Testimony, Pg. 52 – 4/13/26 A.M.)

The Court stated that "[i]t would be multiple conspiracy if your client was involved in a kidnapping conspiracy and he always knew it was a kidnapping conspiracy and then someone else was involved in the conspiracy to assassinate, but that's not what is happening here because it's not your defense that he was involved in a kidnapping conspiracy." (Defense Argument, Pg. 105-06 – 4/28/26) However, in *United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008), the court explained that a multiple conspiracy instruction is appropriate in multi-defendant cases where there is a legitimate concern that a defendant who operated on the periphery of a large, overarching conspiracy will be unfairly grouped in with a larger conspiracy than he intended to join."

The court in *Richardson* explained that the "[t]he multiple conspiracies instruction can be thought of as embodying three possible defense theories." *Id.* "First, that the jury must acquit unless it finds beyond a reasonable doubt that the conspiracy charged in the indictment existed." *Id.* "Second, that even if the charged conspiracy existed, the jury must acquit unless it finds beyond a reasonable doubt that [the defendant] was a member of it." *Id.* "And third, that the jury must acquit unless it finds beyond a reasonable doubt that all of [the defendant's] illegal agreements constituted one conspiracy." *Id.*

Here, through cross-examination Mr. Veintemilla raised all three theories. For instance, a key theme of the cross-examination of all witnesses was their lack of interaction or correspondence with Mr. Veintemilla. Witnesses were questioned directly about Mr. Veintemilla's lack of

13

knowledge of certain meetings, text correspondence, and other key communications. There was consistent testimony that most interactions with Mr. Veintemilla pertained to development projects or democratic change through popular protest. This goes to both a defense theory that the conspiracy as charged in the indictment did not exist, and if it did exist, that Mr. Veintemilla did not have sufficient knowledge to join the conspiracy. Additionally, the testimony from Rodolphe Jaar, J3, and German Alejandro Rivera-Garcia establish that there were separate agreements made in Haiti that clearly established a separate plot to kill President Moïse, of which Mr. Veintemilla had no knowledge.

Together, the evidence adduced at trial, along with the fact that this was a complicated multi-co-defendant conspiracy case, established a clear need for a multiple conspiracy instruction. Indeed, without the instruction, there is "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Fulford*, 267 F.3d at 1245.

## D. The Government's Evidence of Multiple Conspiracies Resulted in a Material Variance from the Indictment

Where an indictment charges a single conspiracy but the proof at trial establishes multiple distinct conspiratorial arrangements, a material variance exists. *See United States v. Caporale*, 806 F.2d 1487, 1499-1500 (11th Cir. 1986). "In determining whether a reasonable trier of fact could have found a single conspiracy, the courts in this Circuit have looked at three factors: 1) whether a common goal existed, 2) the nature of the scheme, and 3) overlap of participants." *Id.* at 1500.

For a wheel conspiracy to exist, all spokes must be aware of and act in furtherance of a single, illicit enterprise. *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004). Without that unifying awareness and common purpose, the government proves multiple separate conspiracies, not one. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). In *Chandler,* the Eleventh Circuit found that a variance between the charged conspiracy and the

14

conspiracies actually proven at trial was plainly prejudicial – the defendants had been convicted, and forced to defend against, conduct never charged. *Chandler,* 388 F.3d at 812.

The testimony of J3, Jaar, and Rivera establishes the existence of a separate, distinct conspiratorial arrangement that formed independently of Mr. Veintemilla. Badio "had control of the national palace" and "each police officer already received $1,000 in U.S. currency," which Rodolphe Jaar was paying for. (Joseph Testimony, Pg. 24 – 4/7/26 P.M.) J3 testified that it was Badio who came into the picture and, together with Vincent and Solages, made the "personal decision" to assassinate President Moïse. (Joseph Testimony, Pg. 26 – 4/9/26 P.M.) This decision was made without CTU or Mr. Veintemilla— J3 confirmed that there was never a sit-down meeting "with CTU concerning the projects that we were about to undertake in Haiti and to talk about assassinating Moise." (Joseph Testimony, Pg. 7 – 4/10/26 P.M.)

Jaar's testimony further confirms the separation. Jaar provided money to Badio for the operation — money collected in Haiti, having nothing to do with Mr. Veintemilla. (Jaar Testimony, Pg. 3-4 – 4/14/26 A.M.) Jaar never met Mr. Veintemilla. (Jaar Testimony, Pg. 3 – 4/14/26 A.M.) J3 also testified that the only person who gave money during the process was Rodolphe Jaar and "it was through Rodolphe Jaar funds that the weapons were purchased." (Joseph Testimony, Pg. 21 – 4/8/26 P.M.)

The testimony of German Rivera-Garcia was particularly illuminating. Rivera-Garcia testified that the plan changed when Badio arrived on scene. (Rivera Testimony, Pg. 8 – 4/17/26 A.M.) Badio instructed that "Mr. President Jovenel Moise should be assassinated." (Rivera Testimony, Pg. 10 – 4/17/26 A.M.) Rivera-Garcia stated that he reported these instructions to Ortiz who told him that they "should abide by Mr. Badio's instructions." (Rivera Testimony, Pg. 11 – 4/17/26 A.M; Pg. 32-33 – 4/20/26 A.M.) According to Rivera-Garcia, Badio instructed to

15

assassinate President Moise, Ortiz instructed Rivera to follow Badio's direction and that Badio was "the new CTU representative in Haiti and . . . the CTU liaison with the Haitian Government." (Rivera Testimony, Pg. 10 – 4/17/26 A.M.) To go even further, Rivera-Garcia stated that "Badio would take charge of covering all the expenses for lodging and food for the Colombians." (Rivera Testimony, Pg. 27 – 4/17/26 A.M.) Importantly, none of these conversations included Mr. Veintemilla. Rivera further confirmed that Jaar's role in the assassination consisted of "providing funds and money, lodging and hotel and food for the Colombians," and that Badio was securing the weapons purchased through Jaar's funds. (Rivera Testimony, Pg. 21 – 4/17/26 A.M.; Joseph Testimony, Pg. 21 – 4/8/26 P.M.) This directly refutes the government's theory that Mr. Veintemilla was the financier who provided material support to the assassination — a plan he was never part of, or even aware of.

Mario Antonio Palacios-Palacios, who was present in Haiti, testified that "Capador, Rivera, James [Solages], and Blanco . . . would procure the materials for [them]." (Palacios-Palacios Testimony, Pg. 23 – 4/14/26 P.M.) In the days leading up to the assassination, Solages was considered one of the bosses in Haiti. (Palacios-Palacios Testimony, Pg. 26 – 4/14/26 P.M.) Jaar and Badio had provided weapons to Palacios-Palacios' group. (Palacios-Palacios Testimony, Pg. 26 – 4/14/26 P.M.) The plan changed to an assassination on July 5th, upon not hearing back from the gang who was supposedly going to assist. (Palacios-Palacios Testimony, Pg. 31-32, – 4/14/26 P.M.; Pg. 33; Pg. 35 – 4/15/26 P.M.) At no point did Palacios-Palacios discuss Mr. Veintemilla's presence at any meetings concerning a plan to assassinate. Moreover, Palacios Palacios testified that he was not present at any meeting amongst "the bosses" including J3, Badio, and the bosses in Miami. (Palacios-Palacios Testimony, Pg. 35 – 4/15/26 P.M.)

Under *Chandler*, the absence of any connection between Mr. Veintemilla and Badio, J3, Jaar, or any of the organizers in Haiti is fatal to the single-conspiracy theory. There is no evidence of any communication, meeting, shared understanding, or common goal between Mr. Veintemilla and Badio's team. Without that connection, the Government proved, at best, that Mr. Veintemilla was a spoke on one side of a rimless wheel, while Badio, Jaar, J3, and the other operational actors located in Haiti formed an entirely separate spoke — with no rim connecting them. 388 F.3d at 808. The Haitian operational conspiracy, Badio, Solages, Vincent, Jaar, and the Colombian operatives, was a distinct arrangement from whatever earlier financial relationship existed involving Mr. Veintemilla in Florida.

Notably, the evidence established that Mr. Veintemilla last provided funds before the assassination on June 22, 2021 in the amount of $2,060. (*See* GX96B6 – Draw Requests) Evidence established that the assassination plan was not developed until at least July 5th, as discussed above by multiple witnesses. The plan was devised by Badio, J3, Jaar, Solages, and the Colombians personally, while in Haiti, without any connection to Mr. Veintemilla whatsoever. A defendant cannot be convicted of a single overarching conspiracy where the evidence establishes that the unlawful objective was planned and executed by a distinct group acting independently of him. *See Chandler*, 388 F.3d at 808 (absent the unifying awareness required to connect the spokes, the government proves multiple conspiracies, not one); *Kotteakos*, 328 U.S. at 755. The fact that Mr. Veintemilla was not present for, and had no knowledge of, the operational planning in Haiti that led to the assassination is further evidence that the government proved multiple conspiracies.

The prejudice from this variance was severe and concrete. Mr. Veintemilla's alleged involvement was limited entirely to financial transactions conducted in Florida — a line of credit

17

and wire transfers — in connection with what he understood to be a political transition operation, with the ultimate goal of helping with infrastructure in Haiti. Mr. Veintemilla was never in Haiti; he was not present for any operational meetings there. He was not responsible for recruiting, organizing, or leading any personnel (i.e. the Colombian nationals). He had no contact with Badio, Jaar, or the Colombian operatives who executed the assassination. He stopped providing money weeks before the assassination plan was even devised.

The variance was not harmless. The Supreme Court in *Kotteakos* recognized that the danger of a single-conspiracy charge that encompasses multiple distinct arrangements is precisely the risk of guilt transference — that a jury, having found one defendant culpable, will carry that finding over to others who had no meaningful connection to the same unlawful objective. *See Id.* at 777. The Court warned that "[t]he dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." 328 U.S. at 774. The Court further cautioned that "as [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals becomes greater and greater." *Id.* at 776. Those dangers are not theoretical here. The government charged a single overarching conspiracy and used it to place before the jury the full horror of the assassination, the operational planning, the smuggling of weapons, the nighttime convoy, and the killing itself, evidence that had nothing to do with Mr. Veintemilla. Having inflamed the jury with that evidence, the government then asked it to convict the one defendant whose conduct never extended beyond wire transfers from Florida in support of what he understood to be a political transition. That is precisely the miscarriage of justice *Kotteakos* was designed to prevent.

Mr. Veintemilla was tried alongside co-defendants whose alleged conduct was categorically different from his own. The jury heard extensive evidence about co-defendants who recruited Colombian operatives with military backgrounds under false pretenses and trained them, who arranged for ballistic vests to be smuggled to Haiti, who led those operatives in the field, and who drove in a convoy to President Moïse's private residence on the night of the assassination. The jury heard detailed testimony about the assassination itself — the night of July 7, 2021, the breach of the residence, the killing. Mr. Veintemilla had no role in any of it and no knowledge of any of it. But the jury that convicted him heard all of it, and the government improperly asked that jury to hold him responsible for it.

### E.  The Provided Jury Instructions Were Confusing and Confused the Jury on Key Issues

As noted in *Fulford*, the inquiry for determining whether the provided jury instructions were sufficient is "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Fulford*, 267 F.3d at 1245. In addition to declining to provide a multiple conspiracy instruction, the Court also erred with the jury charges in two other respects: (1) the jury was improperly instructed on the term "warlike purpose," and (2) the jury was improperly instructed on the definition of "murder".

Mr. Veintemilla objected to the language defining "warlike purpose" in the jury instruction defining "military expedition or enterprise" on the basis that the specific language: "including an attempt to overturn an existing government," was likely to confuse the jury. (Defense Argument, Pg. 37 – 5/1/26 P.M.) During the charge conference, the defense argued that if the jury concludes that people were sent to Haiti to protest or provide a security detail for a campaigning politician, then the provided instruction would mislead the jury into believing that conduct constitutes "an attempt to overturn an existing government." (Defense Argument, Pg. 37 – 5/1/26 P.M.) The

19

defense emphasized that there was a significant risk that the jury may wrongly convict Mr. Veintemilla on that basis. (Defense Argument, Pg. 37 – 5/1/26 P.M.)

The defense further argued that the disputed language "muddles the means with the ends" by conflating political goals with the definition of the unlawful act, which is a military expedition. (Defense Argument, Pg. 39 – 5/1/26 P.M.) The defense explained that there would be no issue defining the term for the jury, but for, the denoted language that expressly invokes political goals, such as lawful regime change, because political goals include protected speech and protected conduct under the First Amendment. (Defense Argument, Pg. 39 – 5/1/26 P.M.) The language was included over Mr. Veintemilla's objection. (Defense Argument, Pg. 39-40 – 5/1/26 P.M.) Indeed, the provided instruction proved to be confusing and failed to sufficiently instruct the jury.

Additionally, in the government's initial proposed jury instructions (DE 1645), the definition of "murder," included the standard Eleventh Circuit pattern language that "the Government must prove beyond a reasonable doubt that the Defendant intended to kill or willfully acted with callous and wanton disregard for the consequences, knowing that a serious risk of death or serious bodily harm would result." *See* Eleventh Circuit Model Crim. Jury Instructions § O45.2. However, during the charge conference, the government argued that part of the instruction should be changed to include the language "the Defendant or a conspirator," as opposed to just "the Defendant." (Defense Argument, Pg. 27 – 5/1/26 P.M.) The government suggested that the language should mirror a different section of the pattern instruction, which reads, "[i]t doesn't matter whether the Defendant or a conspirator hated the victim, or felt any ill will toward the victim at the time." (Defense Argument, Pg. 27 – 5/1/26 P.M.)

Mr. Veintemilla objected, noting that the pattern instruction does not include the "or conspirator" language in that section of the instruction. (Defense Argument, Pg. 30 – 5/1/26 P.M.)

20

The defense argued that if there was going to be a change to the pattern language based on uniformity, it should be to remove the "or conspirator" language from the section referring to hatred or ill will to the victim because "[t]he elements [of the crime charged] are that the defendant must have intended to provide resources to kill or kidnap the president." This argument is akin to the rule of lenity in the sense that if the pattern instruction was to be changed and the change invites ambiguity, it should have been formulated in a manner that favors the accused. The defense further emphasized that the government's proposal was likely to confuse the jury. (Defense Argument, Pg. 30 – 5/1/26 P.M.)

Mr. Veintemilla renewed his objection during the second day of the charge conference. (Defense Argument, Pg. 12 – 5/4/26) At that time, he specifically pointed out that the government's proposed change "eliminates the requirement for conspiracy that the defendant himself agreed or knowingly and intentionally engaged in a conspiracy to kill or kidnap." (Defense Argument, Pg. 12-13 – 5/4/26 P.M.) Again, he emphasized that the government's proposal is both confusing and unnecessary. (Defense Argument, Pg. 13 – 5/4/26) The Court granted the government's proposal over Mr. Veintemilla's objection. (Defense Argument, Pg. 13 – 5/4/26)

The provided instruction failed to properly instruct the jury on the law, and in fact, undermined the governing principle in the law of conspiracy that each conspirator must personally share the intent to achieve the conspiracy's unlawful objective. *See United States v. Croft*, 124 F.3d 1109, 1121-22 (9th Cir. 1997); *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) ("[i]t is a violation of due process for a jury instruction to omit an element of the crime."). As a general matter, for the conspiracy to have murder as its object, the defendant must have agreed to commit an act constituting murder and must have shared the intent that murder be committed. An instruction permitting conviction based on a coconspirator's intent, rather than the defendant's own

21

intent, effectively removes the defendant's personal *mens rea* from the elements the jury must find. To be sure, an instruction that allows the jury to convict the defendant of conspiracy to commit murder based on a coconspirator's intent, rather than the defendant's own intent, effectively relieves the government of its burden to prove the defendant's personal *mens rea*.

Moreover, while the *Pinkerton* doctrine allows a conspirator to be held liable for substantive offenses committed by coconspirators in furtherance of the conspiracy, it only attaches to substantive crimes, not to other conspiracies. *United States v. Armstrong*, 619 F.3d 380, 387 (5th Cir. 2010); *Pinkerton v. United States*, 328 U.S. 640 (1946). In this case, 18 U.S.C. §956 charges the conspiracy itself as the offense as opposed to a substantive murder committed by a coconspirator, thus *Pinkerton* cannot serve as a basis for attributing a coconspirator's intent to the defendant on the conspiracy count.

For these reasons, the provided instruction was erroneous, proved to be confusing, and misled the jury as to what *mens rea* the government needed to prove beyond a reasonable doubt. The provided jury instructions, considered as a whole, did not sufficiently instruct the jury so that the jurors understood the key issues and were not misled.

**F. The Government Was Erroneously Permitted to Admit Prejudicial, Hearsay Evidence from a Non-Co-Conspirator**

Pursuant to Fed. R. Crim. P. 33, the trial court may vacate a judgement and grant a new trial when erroneous evidence is admitted, including hearsay and prejudicial evidence, if the judgement was substantially swayed by the error. As the court explained in *United States v. Magluta*, 418 F.3d 1166, 1180 (11th Cir. 2005), a "non-constitutional error is [only] harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, 'or had but very slight effect.'" *See also United States v. Carter*, 776 F.3d 1309, 1328 (11th Cir. 2015). Additionally, when inadmissible evidence is shown to a jury, the Eleventh Circuit applies

22

the factors articulated in *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994). *See also, United States v. Novaton*, 271 F.3d 968, 1005 (11th Cir. 2001) applying the *Ad-Vantage Telephone* factors in a federal criminal case. The *Ad-Vantage Telephone* factors include the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during trial. *Id.*

At trial, the government elicited testimony and introduced evidence of text communications between Christian Emmanuel Sanon and a non-co-conspirator named Roland Jean Pierre. Mr. Sanon had been severed from the trial and was therefore not a party opponent. Moreover, there was no evidence establishing that Mr. Jean Pierre was a co-conspirator. One of the text communications between the two included a highly prejudicial instructional video on modern warfare. The government not only introduced the video into evidence over the defense's objection but also published the video to the jury over the defense's objection, then had an FBI intelligence analyst narrate the video. (Dayton Testimony, Pg. 13 – 3/27/26 P.M.)

The evidence was elicited from FBI intelligence analyst Kaitlin Dayton. Neither Mr. Sanon nor Mr. Jean Pierre testified during the trial. The video is particularly prejudicial because Ms. Dayton narrated the video and explained its significance from her perspective to the jury. (Dayton Testimony, Pg. 14 – 3/27/26 P.M.) The video was in French and there was no evidence that any of the defendants had seen the video, received it, or understood the contents of the video. To be sure, the video itself was hearsay within hearsay. There were no hearsay exceptions that applied that would render the video admissible. It is important to note that in denying the defense's objections the Court did not provide the jury with a curative instruction. Rather, the Court acknowledged that

23

the defendants never received the video and explained during a sidebar that the proper remedy from the court's perspective was cross-examination. (Dayton Testimony, Pg. 17 – 3/27/26 P.M.)

In applying the *Ad-Vantage Telephone Directory* factors in this case, the error was compounded by the government's strategic decision to have Ms. Dayton narrate the video for the jury. Indeed, the evidence, which was highly prejudicial and inadmissible by itself became a feature of the trial through Ms. Dayton's narration. Moreover, because Ms. Dayton's testimony tied directly into the government's theory of prosecution, it was both intentionally elicited and emphasized. The court did not give the jury a curative instruction to temper the prejudicial effect of the video or Ms. Dayton's testimony. Indeed, Ms. Dayton's narration permeated the trial and infected subsequent evidence elicited by the government. Taken together, the error was not harmless, and it was so prejudicial that the jury's verdict was substantially swayed by the error.

## G. The Government Introduced Improper Evidence Despite the Court's Pre-trial Ruling Prohibiting it on 404(b) Grounds

Rule 404(b) prohibits "[e]vidence of a crime, wrong, or other act...to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Other crimes evidence may be admissible, however, for other purposes, such as to prove intent, knowledge, or absence of mistake or accident. *Id.*

The Eleventh Circuit applies a three-part test for determining the admissibility of evidence under Rule 404(b). *United States v. Perrier*, 619 Fed.Appx. 792, 796 (11th Cir. 2015). "First, the evidence must be relevant to an issue other than the defendant's character." *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003), *abrogated in part* on other grounds by *Rehaif* v. United States, 588 U.S. 225 (2019) . Second, "there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act." *Id.* "Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must

24

meet the other requirements of Rule 403." *Id.*; see Fed. R. Evid. 403. The third prong of the test calls for balancing "the incremental probity of the evidence ... against its potential for undue prejudice." *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013).

Mr. Veintemilla filed a pre-trial Motion *in Limine* (Docket Entry "DE" 1337) asking the Court to preclude 404(b) evidence proffered against him in the Government's 404(b) Notice (DE 1311) related to Government loan fraud allegations. He argued that the proffered evidence consisted of "speculatively fraudulent activities of third-parties, and are not relevant or probative of any element of the crimes charged against [him], but are highly inflammatory and prejudicial." (DE 1337). Critically, the government's notice did not allege that Mr. Veintemilla deceived investors, committed loan fraud, or was aware of any misrepresentations on loan documents or to third parties. Rather, the government sought to attribute the bad acts of others, namely the government's cooperating witnesses, Jacob Israel and Keegan Harricharan, to Mr. Veintemilla to purportedly explain his state of mind. The Court denied the government's 404(b) Notice and granted Mr. Veintemilla's motion *in limine* without prejudice (DE 1380).

The government violated the Court's pretrial ruling by questioning Mr. Harricharan about his prior conviction for PPP loan fraud (Harricharan Testimony, Pg. 56, 85 – 4/23/26 A.M.) and then eliciting testimony regarding a wire transfer from an individual named Marcel Williamson. (Harricharan Testimony, Pg. 69, 73, 76 – 4/23/26 A.M.) Mr. Williamson was one of the subjects of Mr. Veintemilla's Motion *in Limine*. Additionally, Mr. Harricharan explained that his prior PPP loan fraud conviction involved the government's other cooperating witness, Mr. Israel. The implication was that Mr. Harricharan and Mr. Israel were involved in a PPP loan fraud scheme and then funneled that money to Mr. Veintemilla's business. (Harricharan Testimony, Pg. 85 – 4/23/26 A.M.) There were no questions elicited by the government about whether Mr. Veintemilla had any

25

knowledge of the fraud committed by the cooperating witnesses and that is precisely the issue Mr. Veintemilla was concerned about in his pre-trial motion. The insinuation tainted his ability to receive a fair trial. The vague references to PPP loan fraud precluded Mr. Veintemilla from distancing himself from the bad acts of others, which had no probative value in proving the allegations charged in the indictment.

The defense raised several objections to this line of inquiry. (Harricharan Testimony, Pg. 57, 70, 86 – 4/23/26 A.M.)  Notably, Mr. Veintemilla argued that the government's questions were irrelevant and treading dangerously close getting into the PPP fraud allegations that the Court previously prohibited. (Harricharan Testimony, Pg. 57 – 4/23/26 A.M.)  The Court affirmed that "the line they cannot cross is to suggest that Veintemilla was involved in PPP loan fraud," but permitted the line of questioning to continue. (Harricharan Testimony, Pg. 58 – 4/23/26 A.M.) The defense objected again when Mr. Harricharan testified about money wired from Marcel Williamson, noting that the testimony was both irrelevant and precisely what the Court excluded by granting the defense's motion *in limine.* (Harricharan Testimony, Pg. 86 – 4/23/26 A.M.) The Court disagreed and permitted the government to continue. (Harricharan Testimony, Pg. 70, 73 – 4/23/26 A.M.) Finally, Mr. Veintemilla objected to relevance when Mr. Harricharan was asked by the government about a prior criminal case involving PPP loan fraud involving the government's other cooperating witness, Jacob Israel. (Harricharan Testimony, Pg. 86 – 4/23/26 A.M.) The objection was once again overruled. (Harricharan Testimony, Pg. 86 – 4/23/26 A.M.)

Similarly, the government elicited testimony from cooperating witness Jacob Israel about assisting an individual named Jameela Simmons with a PPP loan and then borrowing that money for the Haiti project. (Israel Testimony, Pg. 32, 33 – 4/23/26 P.M.) Mr. Israel detailed his participation in the fraud by noting he was aware of where Ms. Simmons funds came from and he,

26

in fact, assisted her in applying for the PPP loan with his business partner, Jovel Jenkins. (Israel Testimony, Pg. 33 – 4/23/26 P.M.)  He went even further, noting, "we try to help them exaggerate the numbers so we can get a bigger check." (Israel Testimony, Pg. 35 – 4/23/26 P.M.)  The Court sustained the Defense's objection to this line of inquiry, but no curative instruction was provided on the 404(b) issue. (Israel Testimony, Pg. 35 – 4/23/26 P.M.)

More significantly, the government introduced text messages that ambiguously referenced a PPP loan in a text correspondence with Mr. Veintemilla. (Israel Testimony, Pg. 36 – 4/23/26 P.M.) Mr. Israel claimed that the money he raised including money from PPP loan fraud an that such money was intended to bribe Haitian officials. (Israel Testimony, Pg. 36 – 4/23/26 P.M.) Again, the testimony permitted the jury to speculate that Mr. Veintemilla knew the source of funds, rendering this irrelevant evidence highly prejudicial.

Finally, the government elicited testimony and demonstrative evidence from FBI forensic accountant Nestor Mascarell regarding the flow of funds originating from PPP or EIDL loans. (Mascarell Testimony, Pg. 84, 85, 89 – 4/24/26 P.M.; Pg. 28, 47 – 4/27/26 A.M.) Mr. Mascarell testified directly about money that originated from both from Marcel Williamson and Jameela Simmons. (Mascarell Testimony, Pg. 89-90, 92-94 – 4/24/26 P.M.) This testimony had the effect of tying the prior testimony regarding fraud from Mr. Israel and Mr. Harricharan to Mr. Veintemilla. Specifically, one of the charts introduced by the government suggested to the jury that money Mr. Veintemilla's business obtained through lawful PPP and EIDL loans was then wrongly and possibly illicitly used to finance the project in Haiti. It is impossible to separate the testimony from the cooperating witnesses regarding their own loan fraud from the testimony of the forensic accountant, who was at times discussing completely different loans that were not tainted by fraud.

Taken together, the evidence created the inescapable inference that Mr. Veintemilla was involved in fraud.

The evidence presented by the government regarding loan fraud had no probative value as to the conspiracies charged in the indictment and were inadmissible per Fed. R. Evid. §402, which prohibits the admission of irrelevant evidence. Moreover, this evidence created a substantial risk of conviction based on factors other than proof of the elements of the charges. To be sure, Fed. R. Evid. §403 is designed to protect against such inferences, and provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

As such, Rule 403 protects defendants against evidence that creates "an undue tendency to suggest decision on an improper basis." *See United States v. Hooks*, 147 Fed. Appx. 956, 957-58 (11th Cir. 2005) (*citing Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003)); *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1347 (S.D. Fla. 2010); *United States v. Saintil*, 753 F.2d 984, 989, n. 7 (11th Cir.1985). That is precisely what occurred here.

Mr. Veintemilla's ability to defend himself was hamstrung by references to loan fraud that did not directly implicate him, but suggested wrongdoing on his part and was designed merely to impute his character. The government's presentation of loan fraud evidence went beyond simply showing the flow of money. The evidence and its presentation suggested that Mr. Veintemilla was involved in collateral crimes and knew it. It further suggested that this made him more likely to have committed the crimes charged. As such, the introduction of this evidence imputes the concerns addressed by the strictures of Rule 404(b).

28

**H. The Cumulative Error Doctrine Applies Here and a New Trial is Warranted**

Each of the errors detailed above are independently sufficient to warrant a new trial under the court's harmless error analysis because the errors were so significant that they impacted the outcome of the trial and gave rise to "a substantial and ineradicable doubt" as to whether the jury could deliberate with a full understanding of the issues they were tasked with deciding. *See Fulford,* 267 F.3d at 1245; *Carter*, 776 F.3d at 1328. With that said, the Court should consider the cumulative error doctrine, *Pearson*, 746 F.2d at 796; *Wall*, 116 F.4th at 1308-09, and the cumulative effect the errors described above had on Mr. Veintemilla's ability to receive a fair trial.

The court held in *Pearson* that even when errors are by themselves determined to be harmless, their cumulative effect can deprive a defendant of a fair trial. *Pearson*, 746 F.2d at 796. In *Wall*, the court further explained that "[t]he cumulative-error doctrine calls for reversal of a conviction if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *Wall*, 116 F.4th at 1308 (*citing United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021)). The proper procedure for applying the cumulative error doctrine is by "first considering the validity of each claim individually[ ] and then examining any errors that [the Court] find[s] in the aggregate and in light of the trial as a whole to determine whether the [movant] was afforded a fundamentally fair trial." *Id.* (*citing Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)).

In this case, the lack of sufficient evidence to sustain a conviction coupled with a substantial jury instruction error and the admission of highly prejudicial evidence precluded Mr. Veintemilla from receiving a fair trial. As such, the interests of justice demand that a new trial be afforded pursuant to Federal Rule of Criminal Procedure 33(a).

29

## IV.     Relief Requested

Wherefore, for the reasons set forth herein, Mr. Veintemilla respectfully requests that an order be entered for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29(c), or in the alternative, a new trial be granted in the interest of justice pursuant to Federal Rule of Criminal Procedure 33(a).


Dated: July 6, 2026                                       Respectfully submitted.

**KUDMAN TRACHTEN ALOE**                  **DESCALZO LAW, P.A.**
**POSNER, LLP**


Tama Beth Kudman, Esq.                     Marissel Descalzo, Esq
7108 Fairway Drive                         One Biscayne Tower
Suite 130                                  2 South Biscayne Blvd., Ste. 2530
Palm Beach Gardens, Florida 33418          Miami, Florida 33131
Telephone: (561) 472-0811;                 Telephone: (305) 489-1018
Facsimile: (561) 828-0210                  Facsimile: (305) 489-3386
Florida Bar No. 637432                     Florida Bar No. 669318
tkudman@kudmanlaw.com                      md@descalzolaw.com


By: /s/ Tama Kudman                        By: /s/ Marissel Descalzo


### Certificate of Service

I HEREBY CERTIFY that a copy of the foregoing has been served on all counsel of record electronically by utilizing CM/ECF or via electronic mail on July 6, 2026.

By: /s/ Tama Kudman

30